UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KIMBERLY S. TERPSTRA,

                          Plaintiff,

                 v.

SHOPRITE SUPERMARKET, INC.,

                          Defendant.

No. 17-CV-6840 (KMK)

OPINION & ORDER

Appearances:

Michael Howard Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiff*

Jennifer Ann Rygiel-Boyd, Esq.
Michael Nacchio, Esq.
Ogletree, Deakins, Nash, Smoak & Steward, P.C.
New York, NY and Morristown, NJ
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Kimberly S. Terpstra ("Plaintiff") brings this Action against Shoprite Supermarket, Inc.

("ShopRite" or "Defendant"), for unlawful discrimination under Title VII of the Civil Rights Act

of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* (*See generally* Compl. (Dkt. No. 1).)

Before the Court is Defendant's Motion for Summary Judgment (the "Motion"). (*See*

Not. of Mot. (Dkt. No. 25).) For the following reasons, the Motion is granted.

## I. Background

### A. Factual Background

The following facts are taken from Defendant's statement pursuant to Local Civil Rule 56.1, and Plaintiff's response. (*See* Def.'s Statement of Material Facts Pursuant to Local Rule 56.1 ("Def.'s 56.1") (Dkt. No. 27); Pl.'s Resp. to Def.'s 56.1 ("Pl.'s 56.1 Resp.") (Dkt. No. 34).) The facts as described below are not in dispute unless indicated.

Defendant owns and operates several ShopRite supermarkets in New York and New Jersey, including a store in Monticello, New York (the "Monticello Store"). (Def.'s 56.1 ¶ 4.) Plaintiff began working at the Monticello Store as an Overnight Cashier on June 25, 2009. (*Id.* ¶ 5.) Her supervisor was Richard Harms ("Harms"), who held the title of Night Crew Chief at the Monticello Store. (*Id.* ¶¶ 6–7.) At some point during Plaintiff's employment, Harms was terminated because of his involvement in the theft of electronics from the Monticello Store. (*Id.* ¶¶ 8–9.) Plaintiff successfully applied to replace Harms as Night Crew Chief, and was promoted to that position in Fall 2011. (*Id.* ¶ 10.) John Bartley ("Bartley") held the position of Assistant Night Crew Chief, and Joseph Kelly ("Kelly") "was a subordinate Associate" who worked as a part-time Night Crew Clerk. (*Id.* ¶¶ 11–13.) John Berger ("Berger"), who was originally hired by ShopRite in 1987, and worked at numerous stores throughout the Hudson Valley region, became Store Director at the Monticello Store in 2014, assisted by Assistant Store Manager Anthony "AJ" Faber ("Faber"). (*Id.* ¶¶ 14–15.)

#### 1. Discriminatory Remarks by Berger

Plaintiff asserts, primarily citing her own Declaration in support, that Berger "exhibited hostility toward female employees, especially [Plaintiff]." (Pl.'s 56.1 Resp. 25–35 ("Pl.'s

Counter.") ¶ 16.)[1]  First, Plaintiff points to an occasion in which Berger yelled at Plaintiff "unjustifiably" in front of other employees and customers, and states that she "never observed Berger unjustifiably yell at male employees in the same manner." (Pl.'s Counter. ¶¶ 16–19; Decl. of Kimberly Terpstra ("Terpstra Decl.") ¶ 7 (Dkt. No. 36).)  Next, Plaintiff asserts that during her shift on April 14, 2015, Berger brought Plaintiff into an office in the back of the store where there were no security cameras and yelled at her for failing to "count[] empty cardboard boxes from each aisle" when she was "packing out" aisles at the end of her shift.  (Pl.'s Counter ¶¶ 20–26.)  Plaintiff states that Berger "yelled" at her that she "was insubordinate," and he "insisted that [she] step down as crew chief."  (*Id.* ¶ 27; Terpstra Decl. ¶ 9.)  Plaintiff then said she would contact her union representative, and Berger "slid his chair in front of the door to block her from leaving."  (Pl.'s Counter. ¶¶ 30–31.)  After threatening to contact the union again, Berger moved.  (*Id.*)  Plaintiff later received a write up from assistant store manager, Ken Garvey ("Garvey"), for "failing to report piece counts for that evening."  (*Id.* ¶ 32.)  Plaintiff states that the write up "was unjustified" because she "had never been instructed to count cardboard boxes," but rather "was responsible for providing the morning manager with piece count reports indicating how much product each employee packed out overnight, which [she] did routinely." (*Id.* ¶¶ 34–35.)  Plaintiff asserts that when she was not at work, Bartley or Thomas Parlapiano ("Parlapiano"), another male employee, would fill in as acting Night Crew Chief, and that there "is no evidence of any discipline imposed by Berger against any of [her] male assistant crew chiefs for failing to count cardboard boxes when acting as crew chief."  (*Id.* ¶ 39.)

---

[1] Plaintiff included her Counterstatement of Facts as part of her 56.1 Response, rather than as a separate document.

Plaintiff also asserts that while other morning managers would consult with her when they arrived to "see how everything went during the night," Berger "typically avoided her," and would seek out her male assistant crew chief to ask "how the night went." (*Id.* ¶¶ 40–43.) She also asserts that Berger required her to work on weekends, "essentially forcing [her] to work overtime." (*Id.* ¶ 45.)

Plaintiff asserts that her treatment "mirrored [Berger's] treatment of other female employees." (*Id.* ¶ 47.) In his deposition, Bartley indicated that he heard Berger comment "about the role of women in the store . . . [p]lenty of times," including saying that "there w[ere] certain jobs they weren't allowed to do," such as "doing stock" and "supervisor positions." (Pl.'s Decl. Ex. 3 ("Pl.'s Bartley Dep."), at 7–8.) Bartley went on to say that he did not *hear* Berger "say these things," but that "you could tell by what he was doing," such as "taking the women who were in charge and . . . in stock and [giving] them a choice to either move to a different area, like cashier, or to do something else." (*Id.* at 8.) Bartley testified that he "did hear [Berger] say once" that stocking products was "a man's job." (*Id.* 8–9 ("[W]e, like, get a lot of applications for girls, and he was, like, [w]ell, stocking ain't really for girls. And that's exactly what he said.").) Another employee, Bartley's sister Patricia Bartley ("Patricia"), similarly testified that she believes Berger "does not like women," and that this was a motivating factor when he moved her and her sister, who was also employed at the Monticello Store, to cashier positions against their wishes. (Pl.'s Decl. Ex. 4 ("Patricia Dep."), at 49–50 ("I feel he does not like women. That's how I felt when he [made me a cashier]. He did the same thing to my sister. . . . [H]e forced her off the floor and pushed her up front and made her become a cashier.").) Employee Kayla Brundage ("Brundage") estimated that approximately 80% of the Monticello Store's cashiers were women, and that most employees "didn't want to be cashiers" and were

often sent to work as cashiers after they "got in trouble" in other departments. (Pl.'s Decl. Ex. 5 ("Brundage Dep."), at 25–27.)[2] Brundage testified that she did not personally witness Berger mistreat female employees, but that "the general opinion of the store" was that he "didn't like females," and that he did not allow them to work "on the floor packing out," although they had roles "behind counters," "in offices," and "as cashiers." (*Id.* at 32.)

## 2. Plaintiff's Termination

When Plaintiff was first hired on June 8, 2009, she received and signed ShopRite's Associate Handbook, which included the "Associate Purchase Policy" (the "Policy"). (Def.'s 56.1 ¶¶ 18, 25–27.) The Policy stated that all associate purchases at ShopRite must be made "at regular retail [prices], except those items that have been reduced for quick sale and are available to all customers." (*Id.* ¶ 19; *see also* Def.'s Decl. in Supp. of Mot. for Summ. J. ("Def.'s Decl.") Ex. G ("Associate Purchase Policy"), at 2 (Dkt. No. 28).)[3] The Policy also provided that "[u]nder no circumstances will it be permissible to select, purchase, or remove anything from a shelf for consumption or use after the last register has closed down for that night," and that merchandise could not "be set aside for purchasing at a later time." (Associate Purchase Policy 4.) Additionally, the Policy stated that "[f]ailure to pay for any merchandise as outlined here will result in termination," (*id.* at 3), and that any "[f]ailure to follow these procedures could be interpreted as deceptive or dishonest activity and will result in immediate suspension and[,] depending upon the degree of violation, termination of employment," (*id.* at 4). The Policy also

---

[2] Brundage also said that, despite her requests, she was never allowed to move to a different role; however, she does not attribute this to Berger specifically, but rather testified that "every" manager refused to move her, including Berger. (Brundage Dep. at 28–29.)

[3] Because the excerpt containing the Policy is not consecutively paginated, the Court cites to the ECF-generated page number at the upper right corner of each page.

generally bars employees from "misus[ing], steal[ing][,] or consum[ing]" company property or merchandise, and from committing any federal, state, or local crime; failure to comply with this prohibition "will result in immediate termination." (*Id.* at 5.) Finally, the Policy states that "[d]eception practiced with . . . discounting orders and falsification of any records are also considered theft," and "will result in immediate termination." (*Id.* at 6.)[4]

With respect to meat sold at the Monticello Store, only the Meat Department Manager or the store management team were permitted to discount the price of meat. (Def.'s 56.1 ¶ 21.)[5] On February 2, 2016, Meat Department Manager Chad Snyder ("Snyder") discovered that six packages of ground beef had been marked down in price by 50%, and that the username and password of "CGO Coordinator" Ed Pearsall ("Pearsall") were used to enter the discount. (*Id.* ¶ 32.) Snyder informed Faber, who "found the markdown suspicious" because Pearsall had not worked overnight, and because "only the Meat Department Manager, an Assistant Store Manager, or the Store Director are permitted to reduce . . . the price of meat." (*Id.* ¶ 33.) Faber initiated an investigation, and on February 3, 2016, Loss Prevention Manager Marc Hamilton ("Hamilton") and Store Detective Matt Conroy ("Conroy") began reviewing video footage of the night in question to determine who discounted the packages of ground beef. (*Id.* ¶¶ 34–36.) The video footage showed that on February 1, 2016 at 11:19 p.m., Plaintiff and Bartley were standing in front of the ground beef section in the meat case discussing something. (*Id.* ¶ 39.) From 1:12 a.m. to 1:19 a.m., Bartley and Kelly removed several packages of meat from the sales case, and Bartley used a pricing gun to reduce the prices on the packages. (*Id.* ¶¶ 39–40.) Bartley then

---

[4] "Discounting orders" means "reducing the price of something other than the price that's offered to the customer." (Def.'s 56.1 ¶ 22.)

[5] Plaintiff asserts that an authorized manager may also "direct another employee to implement the discount." (Pl.'s 56.1 Resp. ¶ 21.)

carried several packages of meat away from the sales case at approximately 1:20 a.m. (*Id.* ¶ 40.) Then, at 5:55 a.m., Plaintiff and Bartley were recorded each carrying packages of the ground beef that had been removed. (*Id.*) At 6:01 a.m., Plaintiff purchased two packages of the discounted ground beef, Bartley purchased three, and Kelly purchased one. (*Id.*; *see also* Def.'s Decl. Ex. I ("Conroy Memo"), at 3.)[6]

On February 6, 2016, Hamilton separately interviewed Bartley, Kelly, and Plaintiff; Berger and Conroy were present at Plaintiff's interview, as was Billie Josevehia ("Josevehia"), a female employee. (*Id.* ¶¶ 41–42.) Conroy drafted a summary of the interviews. (*Id.* ¶ 43; *see also* Conroy Memo.) In Bartley's interview, he told Hamilton that he marked down the meat because "he thought that it was going to be thrown out," and that he reduced it by 50% because he believed that the "front end" typically discounts meat for sale to customers by 50% after 11 p.m. (Def.'s 56.1 ¶ 45; Conroy Memo 3.) Kelly told Hamilton that he "did not know" he was not allowed to purchase the discounted meat, and that he believed it was not against protocols because Plaintiff, who was the Night Crew Chief, and Bartley, the Assistant Night Crew Chief, did the same. (Def.'s 56.1 ¶ 47; Conroy Memo 3.) According to Conroy's Memo, Plaintiff told Hamilton that Bartley told her to discount the meat, but that she told him she could not discount meat prices; Plaintiff then said that Bartley took it upon himself to mark down the meat, and that she purchased it knowing he had done so and that she "was not supposed to purchase" marked down meat. (Conroy Memo 3.) Plaintiff now denies that she made these statements, (Pl.'s 56.1 Resp. ¶¶ 43, 49); in her deposition, she testified that she "was not aware that [Bartley] had marked [the meat] down," and that she does not recall whether she said in her interview that she

---

[6] Because the Conroy Memo lacks pagination, the Court will cite to the ECF-generated page number at the upper right corner of each page.

was aware she was not allowed to purchase the meat, (Def.'s Decl. Ex. C ("Def.'s Terpstra Dep."), at 155).[7]  Plaintiff signed a handwritten statement on February 6, 2016, stating that she believed that the chopped meat would be thrown out in the morning, that Bartley "took it upon himself" to reduce the price of the meat, that she believed the discount was in accordance with company policy to discount meat at "closing," and that she bought two packages of the meat. (*See* Def.'s Decl. Ex. F ("Pl.'s Statement").)

Berger, "acting in concert" with Loss Prevention and ShopRite upper management, made the decision to "suspend [P]laintiff pending termination."  (Def.'s 56.1 ¶ 56.)  Berger testified that he believed Plaintiff's conduct violated the Policy.  (*Id.* ¶ 58; Def.'s Decl. Ex. D ("Def.'s Berger Dep."), at 115.)  On February 24, 2016, Plaintiff met with ShopRite's Director of Labor Relations, Linda Lussier ("Lussier").  (Def.'s 56.1 ¶ 59.)  Lussier interviewed Plaintiff about her conduct, and avers in her Declaration that Plaintiff told her she had purchased discounted meat knowing that Bartley had reduced the price, and that Plaintiff characterized her conduct as a "lapse in judgment."  (Decl. of Linda Lussier ("Lussier Decl.") ¶ 6 (Dkt. No. 29).)  Lussier determined that Plaintiff's conduct violated the Policy, told Plaintiff that "theft is theft," and offered her the option of either resigning with payment for accrued vacation, or having her employment terminated.  (Def.'s 56.1 ¶ 65.)  Plaintiff refused to resign, and her employment was terminated.  (*Id.* ¶¶ 66–67.)  Bartley also was fired in connection with the incident.  (*Id.* ¶ 69.) However, Kelly was not fired; Berger testified that he and Hamilton discussed Kelly's involvement and determined that he honestly did not believe he was violating company policy by

---

[7] Plaintiff's testimony on this point is inconsistent.  She first denies having said that she knowingly purchased improperly discounted meat and that it was a "lapse in judgment," (Def.'s Terpstra Dep. 153–54), but then states that she could not recall whether she made those statements, (*id.* at 154).  She then ultimately confirms that she "[doesn't] recall saying that," and explains that she was "in shock" after being accused of stealing.  (*Id.* at 155.)

helping discount the meat, and "issued him a corrective action" instead of terminating his employment. (*Id.* ¶ 70; Def.'s Berger Dep. 92–93.) When asked why she was terminated, Plaintiff testified that she "assumed" she was fired "for the ground beef incident." (*Id.* ¶ 68; *see also* Def.'s Terpstra Dep. 143 (testifying that she was terminated because "the[y] believ[ed] that I had something to do with the meat being reduced").) However, later in her deposition she stated that she believed she was fired because of "Berger having an issue with me and wanting me to step down," and that this was because "he wanted a man in charge." (Def.'s Terpstra Dep. at 212–13.)

### B.  Procedural Background

Plaintiff filed her Complaint on September 8, 2017. (Compl. (Dkt. No. 2).) Defendant filed an answer on November 2, 2017. (Answer (Dkt. No. 10).) On April 23, 2018, the Court set a case management schedule. (Scheduling Order (Dkt. No. 14).)

On February 4, 2019, with leave of the Court, (Dkt. No. 21), Defendant filed the instant Motion for Summary Judgment, (Not. of Mot.; Def.'s 56.1; Def.'s Decl.; Def.'s Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 26)). Plaintiff filed an opposition to the Motion on March 8, 2019. (Pl.'s 56.1 Resp.; Pl.'s Decl.; Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 33).) Defendant filed a reply on March 29, 2019. (Pl.'s Reply in Further Supp. of Mot. ("Pl.'s Reply") (Dkt. No. 39); Pl.'s Reply Decl. in Further Supp. of Mot. ("Pl.'s Reply Decl.") (Dkt. No. 40).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading

. . . ."). Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citations and quotation marks omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) ("[I]t is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases." (citations and quotation marks omitted)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

<u>B.  Analysis</u>

Plaintiff brings a single cause of action for unlawful termination on the basis of sex

pursuant to Title VII.  (Compl. ¶ 43.)  Plaintiff's Title VII discrimination claim is analyzed under

the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S.

792 (1973).

> Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a
> preponderance of the evidence a prima facie case of discrimination; it is then the
> defendant's burden to proffer a legitimate non-discriminatory reason for its actions;
> the final and ultimate burden is on the plaintiff to establish that the defendant's
> reason is in fact pretext for unlawful discrimination.

*Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014).  To establish a prima facie

case of discriminatory termination, Plaintiff must demonstrate that "(1) [s]he is a member of a

protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse

employment action; and (4) the adverse action took place under circumstances giving rise to the

inference of discrimination."  *Ruiz v. County of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).

"Although the burden of meeting the prima facie case is 'de minimis,' Plaintiff must adduce

some admissible evidence that would support [her] claims."  *McCall v. Genpak, LLC*, No. 13-

CV-1947, 2015 WL 5730352, at *12 (S.D.N.Y. Sept. 30, 2015) (citation omitted).  "If the

plaintiff successfully establishes a prima facie case, the burden then must shift to the employer to

articulate some legitimate, nondiscriminatory reason for the adverse employment action."  *Walsh*

*v. New York City Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (citation, quotation marks, and

italics omitted).  "If the employer carries that burden, the plaintiff's admissible evidence must

show circumstances that would be sufficient to permit a rational finder of fact to infer that the

defendant's employment decision was more likely than not based in whole or in part on discrimination." *Id.* (citation and quotation marks omitted).

"While summary judgment must be granted with caution in employment discrimination actions, it remains available to reject discrimination claims in cases lacking genuine issues of material fact. Thus, even in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citations and quotation marks omitted).

### 1. Prima Facie Case

Defendant argues that Plaintiff has failed to adduce evidence sufficient to give rise to an inference of gender discrimination. (Def.'s Mem. 9.) However, in support of this proposition, Defendant primarily argues that the evidence demonstrates that Plaintiff was terminated for violating the Policy rather than her gender, which goes to step two of the *McDonnell Douglas* analysis. (Def.'s Mem. 9–12.) The Second Circuit has instructed that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant," *Walsh*, 828 F.3d at 75 (italics omitted) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)), and courts may "proceed directly to the third step of the *McDonnell Douglas* analysis," *id.* at 76 (citation omitted); *see also Woodell v. United Way of Dutchess Cty.*, 357 F. Supp. 2d 761, 771 n.13 (S.D.N.Y. 2005) ("[S]ome courts within this Circuit assume the existence of a prima facie case and move to the ultimate issue of whether the plaintiff has proven that it is more likely than not that the employer's discriminatory decision was motivated at least in part by an 'impermissible,' or discriminatory, reason." (citation and quotation marks omitted)). Because

Defendant's Memorandum focuses primarily on its legitimate reason for terminating Plaintiff's employment, the Court will assume Plaintiff has established a prima facie case, and begin by assessing whether Defendant has sufficiently established a non-discriminatory basis for Plaintiff's termination. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 447 (2d Cir. 1999) (assuming prima facie case of discrimination was established where the defendant "has satisfied its burden of production by proffering admissible evidence of a legitimate, nondiscriminatory reason for denying [the plaintiff's] promotion"), *as amended on denial of reh'g* (Dec. 22, 1999); *Yeger v. Inst. of Culinary Educ., Inc.*, No. 14-CV-8202, 2017 WL 377936, at *10 (S.D.N.Y. Jan. 25, 2017) ("[G]iven the minimal burden required at the prima facie stage, the Court assumes for purposes of this analysis that Plaintiff has satisfied the fourth prong of the prima facie case as well, and moves to the second step of the *McDonnell Douglas* analysis."); *Finney v. Planned Parenthood of New York City, Inc.*, No. 02-CV-7942, 2003 WL 22928730, at *5 (S.D.N.Y. Dec. 10, 2003) ("Since we are required at this stage in the proceedings to view the evidence in the light most favorable to [the] plaintiff, . . . we will . . . assume that the prima facie case is satisfied." (citing *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 165 (2d Cir. 2001), and *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001))).

## 2.  Legitimate Basis for Termination

At the second stage of the *McDonnell Douglas* framework, an employer's burden is to "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citation, emphasis, and quotation marks omitted); *see also Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) (same). This "burden of showing a legitimate[,] non-

discriminatory reason for its actions is not a particularly steep hurdle." *Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005). "Any legitimate, nondiscriminatory reason will rebut the presumption triggered by the prima facie case." *Ramos v. Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 337 (S.D.N.Y. 2001) (quoting *Fisher v. Vassar College*, 114 F.3d 1332, 1335–36 (2d Cir. 1997)).

Defendant has provided substantial evidence in support of its argument that Plaintiff was fired because she improperly purchased discounted meat in violation of company policy. Specifically, Defendant submitted, inter alia, the Policy signed by Plaintiff, (*see* Associate Purchase Policy), deposition testimony of Bartley, Faber, and Plaintiff herself confirming that she purchased meat that had been marked down by Bartley, (*see* Def.'s Decl. Ex. E ("Def.'s Bartley Dep."), at 32; Def.'s Decl. Ex. H ("Faber Dep."), at 67–68; Def.'s Terpstra Dep. 157 ("Q. And you did buy two packages? A. I did.")), deposition testimony from Berger indicating that, as Store Director, he believed that Plaintiff's conduct violated the Policy and accordingly suspended Plaintiff pending termination, (*see* Def.'s Berger Dep. 87, 115), evidence of Plaintiff's February 24, 2016 meeting with Defendant's Director of Labor Relations, at which her union representative was present, to discuss the violation and determine whether termination was appropriate, (*see* Def.'s Terpstra Dep. 158–59; Decl. of Linda Lussier ("Lussier Decl.") ¶¶ 4–7), and testimony regarding Plaintiff's ultimate termination by Lussier after that meeting, (*see* Lussier Decl. ¶¶ 6–7; Def.'s Terpstra Dep. 160). This evidence is sufficient to satisfy Defendant's burden to proffer a legitimate reason for Plaintiff's termination. *See Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 770 (E.D.N.Y. 2018) (holding defendants met burden to demonstrate legitimate reason for termination where they produced evidence that the plaintiff, a teacher, "was suspended and ultimately terminated because of a series of serious

allegations regarding the mistreatment of students, which was reported by multiple employees");

*Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 579 (S.D.N.Y. 2012) (holding defendants

sufficiently proffered neutral justification for termination where the defendants "adduced

substantial, indeed overwhelming, documentary and testimonial evidence" that the particular

program the plaintiff worked for was "in increasingly dire financial circumstances . . . and that

these budgetary shortfalls caused the reduction in force that encompassed [the plaintiff]"), *aff'd*,

526 F. App'x 124 (2d Cir. 2013); *Vasquez v. Claire's Accessories, Inc.*, 392 F. Supp. 2d 342, 353

(D. Conn. 2005) (holding employer met burden to establish legitimate reason for termination

where it had a published policy that prohibited non-employees from being in the store after

opening hours, and produced evidence that the plaintiff was aware of and violated the policy);

*see also Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 14 (2d Cir. 2018)

(holding that the employer met its burden of giving a legitimate, non-discriminatory reason for

terminating the plaintiff where employer produced evidence that the plaintiff "was terminated in

part for violating [the employer's] attendance policy, outlined in its employee handbook").

Whether Plaintiff's conduct in fact violated the Policy is not relevant; it is sufficient that

Defendants have produced evidence demonstrating that this was the basis of her termination, and

the burden now shifts to Plaintiff to show that the proffered reason was a pretext for

discrimination.  *See Senese*, 330 F. Supp. 3d at 770 ("[C]ourts have consistently held that they

may not second-guess an employer's non-discriminatory business decisions, regardless of their

wisdom, unless there is actual evidence that they were motivated by discrimination."); *Vahos v.

Gen. Motors Corp.*, No. 06-CV-6783, 2008 WL 2439643, at *6 (E.D.N.Y. June 16, 2008) ("[The

plaintiff] also argues that he never violated the [company's] Policy.  What is most relevant here

is whether [the defendant] legitimately thought that [the plaintiff] had violated the Policy, and

not whether [he] actually violated the Policy." (citing *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006))). The Court will therefore move on to the third step of the *McDonnell Douglas* analysis.

### 3. Pretext

Under the third step of *McDonnell Douglas*, the burden is on Plaintiff to establish at least a dispute of fact that proves that Defendant's proffered legitimate, nondiscriminatory reason for firing her was pretextual. *See Abrams*, 764 F.3d at 251 ("[T]he final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination."). "The Second Circuit has explained that 'there are two distinct ways for a plaintiff to prevail—either by providing that a discriminatory motive, more likely than not, motivated the defendants or by proving that the reasons given by the defendants are not true and that discrimination is the real reason for the actions.'" *Rasmy v. Marriott Int'l, Inc.*, 343 F. Supp. 3d 354, 365 (S.D.N.Y. 2018) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). To sustain her burden, Plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by [Defendant] were false, and that more likely than not [disability] discrimination was the real reason for the [termination]." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (citation, alteration and quotation marks omitted); *see also Hicks*, 509 U.S. at 515 (1993) ("[A] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." (emphasis and quotation marks omitted)). "It is not enough, in other words, to disbelieve [Defendant]; the factfinder must believe . . . [P]laintiff's explanation of intentional discrimination." *Hicks*, 509 U.S. at 519 (emphasis omitted).

Plaintiff argues that Defendant's neutral justification for her termination—violation of the Associate Purchase Policy—was a pretext for gender discrimination. (Pl.'s Mem. 14–20.) Specifically, Plaintiff asserts that because Berger "made the decision to fire" Plaintiff, (*id.* at 10), and had a history of "generally less favorable treatment of women in the store," (*id.* at 13), a reasonable jury could conclude that gender was the true reason Plaintiff was fired. Plaintiff also argues that the fact that she was terminated for her conduct, but Kelly was not, further supports a finding of pretext. (*Id.* at 15–17.)

Plaintiff cites several examples that she argues demonstrate Berger's bias against women and his ongoing attempt to terminate Plaintiff because of her gender. First, Plaintiff points to an occasion in which Berger yelled at Plaintiff "unjustifiably" in front of other employees and store customers. (Pl.'s Mem. 4.) Plaintiff avers that she "never observed Berger unjustifiably yell at male employees in the same manner." (Decl. of Kimberly Terpstra ("Terpstra Decl.") ¶ 7.) Next, Plaintiff asserts that during her shift on April 14, 2015, Berger brought Plaintiff into an office in the back of the store where there were no security cameras and yelled at her for failing to "count[] empty cardboard boxes from each aisle" when she was "packing out" aisles at the end of her shift. (Pl.'s Mem. 4.) Plaintiff states that Berger "yelled" at her that she "was insubordinate," and that he "insisted that [she] step down as crew chief." (Terpstra Decl. ¶ 9.) Plaintiff then said she would contact her union representative, and Berger "slid his chair in front of the door to block [her] from leaving." (*Id.*) After again threatening to contact the union, Berger moved. (*Id.*) On another occasion, Plaintiff says that Berger directed an assistant store manager, Ken Garvey ("Garvey"), to write her up for "failing to report piece counts for that evening." (*Id.* ¶ 10.) Plaintiff states that the write up "was unjustified" because she "had never been instructed to count cardboard boxes," but rather "was responsible for providing the morning

manager with piece count reports indicating how much product each employee packed out overnight, which [she] did routinely." (*Id.*) Plaintiff avers that when she was not at work, Bartley or Thomas Parlapiano ("Parlapiano"), another employee, would fill in as crew chief, and that she was "not aware of any discipline imposed by Berger against any of [her] male assistant crew chiefs for failing to count cardboard boxes when acting as crew chief." (*Id.* ¶ 11.)

Plaintiff asserts that while other morning managers would consult with her when they arrived to "see how everything went during the night," Berger "typically avoided her," and would seek out her male assistant crew chief to ask "how the night went." (*Id.* ¶ 12.) She also asserts that Berger required her to work on weekends, "thus essentially forcing [her] to work overtime." (*Id.* ¶ 13.)

Plaintiff also argues that Berger had a "reputation in the store" for disliking women. (Pl.'s Mem. 6.) In support, Plaintiff points to Bartley's deposition, in which he indicated that he heard Berger comment "about the role of women in the store . . . [p]lenty of times," including saying that "there w[ere] certain jobs they weren't allowed to do," such as "doing stock" and "supervisor positions." (Pl.'s Bartley Dep. 7–8.) Bartley went on to say, however, that he did not *hear* Berger "say these things," but that "you could tell by what he was doing," such as "taking the women who were in charge and . . . in stock and [giving] them a choice to either move to a different area, like cashier, or to do something else." (*Id.* at 8.) Bartley testified that he "did hear [Berger] say once" that stocking products was "a man's job." (*Id.* ("[W]e, like, get a lot of applications for girls, and he was, like, [w]ell, stocking ain't really for girls. And that's exactly what he said.").) Another employee, Bartley's sister Patricia Bartley ("Patricia"), similarly testified that she believes Berger "does not like women," and that this was a motivating factor when he moved her and her sister, who was also employed at the Monticello Store, to

cashier positions against their wishes. (Patricia Dep. 49–50 ("I feel he does not like women. That's how I felt when he [made me a cashier]. He did the same thing to my sister. . . . [H]e forced her off the floor and pushed her up front and made her become a cashier.").) Plaintiff also points to Brundage's testimony, in which she stated that Berger was reputed to dislike women and that he relegated women to certain positions within the Monitcello Store. (*See* Brundage Dep. 25–31.) Finally, Plaintiff points to the fact that Kelly, who is male, purchased discounted meat but was not terminated, as evidence that the Policy violation was mere pretext to eliminate her. (Terpstra Decl. ¶ 16.)

Defendant disputes that these incidents, even taken together, could allow a jury to find that the stated reason for Plaintiff's termination was a pretext for discrimination. First, with respect to the fact that Kelly was not terminated for the same conduct, Defendant argues that Kelly is not a valid comparator because he was not a supervisor, and that Bartley, who is male and *did* hold a supervisor position, was in fact terminated for the same conduct as Plaintiff. (Def.'s Reply 1–2; Def.'s 56.1 ¶ 88; Pl.'s Bartley Dep. 9.) With respect to Berger's statement that stocking "ain't really for girls," Defendant notes that Berger denies saying this, and that in any event, the comment was not made in reference to Plaintiff. (Def.'s Reply 5.) Regarding the incidents in which Plaintiff says that Berger yelled at her, Defendant argues that, even if true, there is no evidence Berger's animus was related to Plaintiff's gender. (*Id.* at 5–6.) In support, Defendant points to the fact that male employees testified that they had similar tasks and were likewise criticized by Berger. (*Id.* at 6; Def.'s Reply Decl. Ex. A ("Parlapiano Dep."), at 60; Def.'s Bartley Dep. 32–33 ("It was pretty much the same thing he was doing to me.").) With respect to Plaintiff's assertion that Berger placed women in cashier roles rather than stocking or supervisory positions, Defendant argues that there is insufficient evidence to show that any of the

women Berger moved to cashier positions was transferred because of her gender. (Def.'s Reply 7.) Finally, Defendant points out that the final decision to terminate Plaintiff's employment was made by Lussier, not Berger. (*Id.* at 8.)

"In cases in which multiple employees [who are not all members of the protected class] are terminated for the same infraction, courts generally find that the plaintiff has failed to meet the fourth element [of a prima facie case of discrimination]—that circumstances give rise to an inference of discriminatory intent." *Rasmy*, 343 F. Supp. 3d at 364 (collecting cases); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 568 (2d Cir. 2000) ("Not only did [the plaintiff] fail to produce evidence that non-Hispanic employees who [violated company policy] escaped termination, the record reveals that [the defendant] also terminated [another employee], who is not Hispanic, on the [same violation]. The reasonable inference, therefore, is that [the defendant] enforced the policy against [the plaintiff] not because she is Hispanic, but because she [violated company policy]."); *Kellman v. Yale-New Haven Hosp.*, 99 F. Supp. 2d 222, 226 (D. Conn. 2000) ("There can be no inference of unlawful racial discrimination in this case on the basis that the disciplinary action against the [African-American] plaintiff was more severe than the disciplinary action taken against [a similarly situated white employee] because the disciplinary action taken by the Hospital against both the plaintiff and [the white employee] was identical."). Courts have also found that such circumstances defeat a plaintiff's attempt to demonstrate pretext. *See, e.g.*, *Cruz*, 202 F.3d at 568 (finding there was "no evidence to establish" that the reason given for a Hispanic plaintiff's termination "was a pretext for race discrimination" where "the documents and deposition testimony in the record all indicate that Human Resources personnel decided to terminate both [the plaintiff] and [a non-Hispanic employee]" for violating company policy); *Daniel v. AutoZone, Inc.*, No. 13-CV-118, 2015 WL 2114158, at *4 (N.D.N.Y.

May 6, 2015) (finding claims of pretext for racial discrimination "particularly suspect in light of the fact that . . . a Caucasian male[] was also terminated as a result of the same incident, and [the] defendants' uncontroverted facts show[] that several other Caucasian males were terminated for the same reason in recent years" (citation omitted)); *Albuja v. Nat'l Broad. Co. Universal, Inc.*, 851 F. Supp. 2d 599, 614–15 (S.D.N.Y. 2012) ("Because . . . employees of all racial backgrounds were terminated . . . and . . . were instructed that there existed no job openings available to them within [the company], [the] [p]laintiffs cannot present evidence demonstrating pretext in [the company]'s proffered nondiscriminatory reason for terminating them."); *Casanova v. Gen. Mills Restaurants, Inc.*, No. 94-CV-4386, 1997 WL 473840, at *6 (E.D.N.Y. Aug. 15, 1997) (holding a Hispanic plaintiff failed to establish pretext where "three other similarly situated employees who were not Hispanic were also terminated for conduct similar to [the plaintiff's]").

The fact that Bartley, who is male, was terminated along with Plaintiff significantly undermines any inference that her termination was motivated by gender discrimination. *See Dhir v. Wells Fargo Bank, N.A.*, No. 14-CV-1905, 2017 WL 830387, at *7 (D. Conn. Mar. 1, 2017) (holding the plaintiff, a female store manager born in India, failed to establish an inference of discrimination despite the fact that her position "was filled by a Caucasian male" where "the only other Store Manager in Connecticut who was terminated [for the same reason] was also a white man"); *Morales v. Rooney*, No. 06-CV-1556, 2010 WL 11469915, at *8 (D. Conn. Mar. 31, 2010) (holding the plaintiffs, both Hispanic fire inspectors, were "treated the same as similarly situated fire inspectors" where six inspectors were found to have engaged in misconduct, and five of those fire inspectors were terminated, three of whom were Caucasian); *David v. Comtech PST Corp.*, No. 03-CV-6480, 2006 WL 2713936, at *13 (E.D.N.Y. Sept. 22,

2006) ("[E]ven though, as discussed above, [the plaintiff] has raised a question of fact as to whether she was thereafter replaced by . . . [a] younger [employee who] is also a male, any inference of discrimination raised on the basis of his gender is defeated by the fact that [a male] was also fired on the same day").  Plaintiff attempts to evade this conclusion by arguing that Kelly was similarly situated to her and was not terminated for his violation of the Policy. However, Defendant submitted evidence that the relevant decisionmakers chose not to terminate Kelly because he "was a subordinate night crew clerk . . . [and] it was determined that he was following the example set by his supervisors, Mr. Bartley and [Plaintiff]."  (Lussier Decl. ¶ 8; *see also* Def.'s Berger Dep. 92–93; Decl. of Marc Hamilton ("Hamilton Decl.") ¶ 11 (Dkt. No. 30).) Plaintiff nonetheless argues that Kelly was similarly situated because he and Plaintiff "were subject to the same workplace standards—specifically, the Associate Purchase Policy."  (Pl.'s Mem. 16.)

In determining whether an employee was "similarly situated" to co-employees for purposes of Title VII disparate treatment analysis, courts consider "(1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness."  *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (citation omitted); *see also Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 256 (S.D.N.Y. 2015) ("To be similarly situated, other employees must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." (citation, alterations, and quotation marks omitted)).

Although Plaintiff and Kelly were both subject to the Policy, Plaintiff and Bartley each held a supervisory position; Kelly was their subordinate. Even though all three were found to have violated the Policy, Kelly was permitted to return to work after his suspension after Hamilton and Berger determined through Hamilton's investigation that Kelly truthfully believed he was not violating company policy, specifically because his supervisors, Plaintiff and Bartley, were engaging in the same conduct. The Second Circuit has recognized that an employee "who is expected to lead others might well be held to a higher standard of conduct than a lower-level functionary." *Hargett v. Nat'l Westminster Bank*, 78 F.3d 836, 839 (2d Cir. 1996) ("Requiring higher-ups to conform to a higher standard of decency is not contrary to established law and does conform with common sense."); *see also Shaw v. McHugh*, No. 12-CV-6834, 2015 WL 1400069, at *9 (S.D.N.Y. Mar. 26, 2015) ("[S]upervisors are generally not considered materially similar to supervisees."), *aff'd*, 641 F. App'x 95 (2d Cir. 2016). Plaintiff's own "admission that it was her responsibility to make sure [employees] were complying with [Shoprite] policies," and failure to allege or demonstrate that Kelly had similar responsibilities as a part-time Night Crew Clerk, "is dispositive of the issue of whether [she and Kelly] are comparators." *Robertson v. Wells Fargo Bank, N.A.*, No. 14-CV-1861, 2017 WL 326317, at *9 (D. Conn. Jan. 23, 2017). (*See* Pl.'s Decl. Ex. 1 ("Pl.'s Terpstra Dep.") 60 ("Q. What were your duties as a night crew chief? A. Organize the crew, assign their positions, oversee everything, check coolers, open the store in the morning."); Def.'s Terpstra Dep. 214 ("Q. Do you agree that a night crew chief, or any manager, is responsible for setting a positive example . . . for compliance with company policy? A. Yes.").)

Plaintiff correctly notes that, although position is relevant to the analysis, "employees need not be of the exact same rank to be considered 'similarly situated'" in every case. (Pl.'s

Mem. 17 (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 n.7 (2d Cir. 2010)).)

However, here Defendant not only specifically identified Kelly's subordinate position as the

reason he was not terminated; but also *did* terminate Bartley, who, like Plaintiff, held a

supervisor position and was found to have committed the same violation. Plaintiff has therefore

produced no evidence suggesting that Kelly was allowed to continue working because he was

male while Plaintiff was fired because she is female, as another male employee who held a

position comparable to Plaintiff's was fired for identical conduct. *See Lioi v. New York City*

*Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 585 (S.D.N.Y. 2012) ("[T]hat both [the

plaintiff] and her male co-worker were suspended for the same incident significantly undermines

[her] claim that the suspension was tied to gender"); *see also Graham*, 230 F.3d at 39 (noting

that it is the plaintiff who "must show she was similarly situated in all material respects to the

individuals with whom she seeks to compare herself" (citation and quotation marks omitted)).

Although Plaintiff argues that Kelly and Bartley were more culpable because they were

the ones who discounted the meat and removed it from the display, while Plaintiff only

purchased it, Hamilton and Lussier each concluded, after an investigation that included

reviewing video footage and interviewing those involved, that Plaintiff knowingly purchased

discounted meat in violation of the policy, and Lussier independently decided that this conduct

merited termination. (Lussier Decl. ¶¶ 5–6; Hamilton Decl. ¶¶ 5–6, 9, 12.) Plaintiff has

submitted no evidence that these conclusions were influenced by Plaintiff's gender or by

Berger's tainted opinion, as is her burden. *Rasmy*, 343 F. Supp. 3d at 364–66 (holding the

plaintiff failed to prove pretext where both employees who violated company policy "were

suspended and later terminated" after the company "reviewed the incident reports both

[employees] provided, reviewed available video surveillance, interviewed [the two employees]

and [an] eyewitness, reviewed the eyewitness's written statement, and interviewed an additional potential witness" (citation omitted)); *Brown v. CSX Transportation Inc.*, 155 F. Supp. 3d 265, 275–76 (W.D.N.Y. 2016) (finding no disparate treatment where "a Caucasian male[] was only terminated for cheating after there was a presentation of physical evidence and an admission, whereas [the] [p]laintiff was terminated for cheating with no physical evidence or admission of guilt," because this "does not change the fact that . . . [e]ach employee was subject to a formal hearing and ultimately terminated based on charges of cheating"). Furthermore, Plaintiff's conduct "need not be identical to that of [Bartley] for the two to be similarly situated"; rather, the test is whether the conduct was of "comparable seriousness." *Graham*, 230 F.3d at 40.

Finally, Plaintiff fails to present evidence that Defendant "deviated from its general policies and procedures when it terminated" her. *Walcott v. Cablevision*, No. 10-CV-2602, 2012 WL 4447417, at *10 (E.D.N.Y. Sept. 24, 2012) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). While Defendant points to at least one additional example of a Night Crew Chief, who was male, being fired pursuant to the Policy for theft of store property, (Def.'s 56.1 ¶ 9), Plaintiff testified that she could not recall any instance of a managerial employee who "was alleged to have violated the associate purchase policy and not terminated," (Def.'s Terpstra Dep. 112.) Therefore, Plaintiff fails to carry her burden to show that the reason given for her termination was a pretext based on Defendant's failure to terminate Kelly.

The remainder of Plaintiff's argument for pretext focuses on evidence that Berger, the store manager, held sexist views and believed that women should not be in stocking or supervisory positions. However, Berger was not the ultimate decisionmaker who terminated Plaintiff's employment. "Courts of this district have held that [a] plaintiff's failure to provide

evidence of bias on the part of the person(s) responsible for an adverse employment action is grounds for dismissal of a Title VII claim." *Randolph v. CIBC World Markets*, No. 01-CV-11589, 2005 WL 704804, at *13 (S.D.N.Y. Mar. 29, 2005) (collecting cases); *see also Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 309 (S.D.N.Y. 2000) (finding it "fatal to [the] plaintiffs' case that they only allege that [two supervisors], and not any of the decision-makers who were responsible for their termination[,] harbored discriminatory feelings for them").

Plaintiff argues that despite the fact that Lussier made the final decision to end Plaintiff's employment, Berger made the initial recommendation that she be terminated, and his "biased attitudes tainted the decision, whether he was the final decision-maker or not." (Pl.'s Mem. 19) But Plaintiff cites no record evidence in support of the assertion. The record shows that at Berger's deposition, when asked whether he made the determination to terminate Plaintiff based on violation of the Policy, he testified, "[w]ith advice from loss prevention and the home office." (Def.'s Berger Dep. 87 ("Q. So the answer is yes? A. Yes.").) Berger was then asked, "[y]ou were the decision maker?" (*Id.*) He responded, "[i]t would have been my decision to suspend her pending termination, and then it goes to a union meeting." (*Id.*) Berger next confirmed that "[a]t the union meeting, the subject of the union meeting was [his] determination to terminate her," and that the union meeting "was held to appeal [his] determination to terminate." (*Id.* at 88.)

Lussier, as the former Director of Associate and Labor Relations, was responsible for hearing Plaintiff's appeal of that decision. (Lussier Decl. ¶ 1.) Lussier met with Plaintiff and her union representative, and states in her Declaration that "[t]he purpose of this meeting was for [her] to make the decision on whether or not [Plaintiff]'s employment with [Shoprite] would be terminated." (*Id.* ¶ 4.) Lussier recalls that Plaintiff admitted that she had purchased discounted

meat and that she "understood" that this violated the Policy, and "characterized her behavior as a 'lapse in judgment'"; Lussier "responded to [Plaintiff] by telling her that 'theft is theft,'" and offering her the option to resign with severance or be terminated. (*Id.* ¶¶ 5–6.) After she declined to resign, Lussier "told her that she was terminated." (*Id.* ¶ 6.) There is no indication in the record that Plaintiff raised the issue of discrimination with Lussier at that meeting.[8] In her deposition, Plaintiff confirmed that Lussier was "the person who . . . fired [her]," and stated that she "assumed it was [because of] the chopped meat incident." (Def.'s Terpstra Dep. 160.) However, she later testified that she believed she was fired because of "Berger having an issue with me and wanting me to step down," and that this was because "he wanted a man in charge." (Pl.'s Terpstra Dep. 212–13.)[9]

Where the ultimate decision maker is significantly influenced by termination recommendations from a plaintiff's supervisor and makes no independent inquiry, the plaintiff is not required to demonstrate animus on the part of the decision maker, and may evade summary judgment by presenting evidence of discrimination by supervisors. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 126 (2d Cir. 2004) (reversing grant of summary

---

[8] Plaintiff testified that she could not recall any questions that Lussier asked in that meeting, nor any of her own responses. (Def.'s Terpstra Dep. 159.)

[9] In her deposition, Plaintiff denied saying that she knowingly purchased improperly discounted meat and that it was a "lapse in judgment," (Def.'s Terpstra Dep. 153–54), but then later stated that she could not recall whether she made those statements, (*id.* at 154). She then confirmed that she "[doesn't] recall[] saying that," and explains that she was "in shock" after being accused of stealing. (*Id.* at 155.) In her Declaration, Plaintiff unequivocally denies saying in her interview with Hamilton and Conroy that she knowingly purchased meat that was improperly discounted and that her conduct reflected a "lapse in judgment." (Terpstra Decl. ¶ 15.) Plaintiff also denies having made these admissions to Lussier, but cites no record evidence in support. (Pl.'s 56.1 Resp. ¶¶ 62, 64.) Plaintiff nowhere indicates what she *did* say during her interview, or point to any evidence that Hamilton and Lussier fabricated these confessions as a result of discriminatory bias. Nor does she deny that Lussier indicated in their meeting that she believed Plaintiff's conduct constituted theft warranting termination. (*Id.* ¶ 65.)

judgment where the plaintiff's immediate supervisors "were responsible for evaluating [the plaintiff's] performance . . . and in so doing, made numerous accusations of poor performance," and the decision-maker cited those evaluations as "the sole factor" considered when deciding the plaintiff should be terminated); *see also Hinton v. The City Coll. of N.Y.*, No. 05-CV-8951, 2008 WL 591802 at *17 (S.D.N.Y. 2008) ("Requiring a Title VII plaintiff to prove that the ultimate decisionmakers . . . who may in fact give minimal scrutiny to recommendations received from below, were motivated by prohibited animus, would erect an insurmountable barrier for many plaintiffs who have experienced discrimination or retaliation that Title VII is intended to remedy."). In other words, "in order to establish proximate cause, a plaintiff must show that the unlawfully motivated act 'was sufficiently close to the ultimate injury, and sufficiently important in producing it, to make it reasonable to follow liability back to' that act." *Spratt v. Verizon Commc'ns Inc.*, No. 11-CV-273, 2014 WL 4704705, at *12 (S.D.N.Y. Sept. 17, 2014) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 703 (2004)), *aff'd*, 633 F. App'x 72 (2d Cir. 2016).

In this case, Berger made the initial recommendation to suspend Plaintiff pending termination, but Hamilton conducted an independent investigation, including reviewing video footage and interviewing each employee, and Lussier interviewed Plaintiff with her union representative present before ultimately deciding to terminate Plaintiff's employment. Lussier nowhere indicates that she considered Berger's recommendation in making her decision, and Plaintiff has adduced no evidence that Lussier relied on Berger's opinion of Plaintiff's job performance; in fact, Lussier's Declaration states that Berger "was required" to suspend Plaintiff pending termination, and explains that she relied on Plaintiff's own admissions in connection with this specific incident in deciding that termination was appropriate. (Lussier Decl. ¶¶ 2, 6–7.) Hamilton similarly avers in his Declaration that "protocol require[d] that [Berger] suspend

all of the suspected transgressing employees during the investigation," but that the "final determination of discipline" was made by Lussier at the subsequent union meeting. (Hamilton Decl. ¶ 12.)[10]

"When courts in this circuit hold that someone other than the ultimate decision maker 'taint[ed] the ultimate employment decision in violation of Title VII,' there is typically some concrete evidence (or a plausible allegation) that the ultimate decision maker, in issuing the challenged employment decision, relied on statements made by the person harboring retaliatory or discriminatory animus." *Hua Lin v. N.Y. State Dep't of Labor*, No. 14-CV-771, 2017 WL 435811, at *9 (N.D.N.Y. Feb. 1, 2017) (quoting *Bickerstaff*, 196 F.3d at 450), *aff'd*, 720 F. App'x 89 (2d Cir. 2018); *see also Back*, 365 F.3d at 126 (holding summary judgment was inappropriate where the decisionmaker cited the recommendations of plaintiff's supervisors, who had made discriminatory remarks, as the "sole factor" considered in the decision to terminate the plaintiff's employment). Discriminatory animus "of intermediate supervisors who have input in the decisionmaking process will not give rise to liability if the supervisor with final authority bases an adverse employment action exclusively on an independent evaluation." *Hua Lin*, 2017 WL 435811, at *9 (citation and quotation marks omitted); *see also Hua Lin*, 720 F. App'x at 91(affirming grant of summary judgment because "there [wa]s no indication that the final decision maker was influenced by the former supervisor" whose emails reflected that she

---

[10] Notably, although Plaintiff testified that she believed Berger "was just going to look for [any] little thing and try and say that [she] did something [wrong]" in order to justify terminating her employment, (Def.'s Terpstra Dep. 212), Plaintiff also asserts that she received multiple write ups in the course of her employment and that Berger "approved all write ups," including having signed at least one of them, (Pl.'s 56.1 Resp. ¶ 95; Pl.'s Decl. Ex. 2 ("Pl.'s Berger Dep."), at 69–70). Yet, Plaintiff was never fired for any of these performance issues, and Berger testified that these infractions "weren't serious enough" to warrant termination, (Pl.'s Berger Dep. 90), undermining both Plaintiff's belief that Berger was looking for "any little thing" to fire Plaintiff, and her argument that he had final authority to terminate employees.

harbored retaliatory animus and sought to prevent the plaintiff from being considered for a new position, such as evidence that "would tend to show that the decision maker relied on the emails or was manipulated by the former supervisor" (citations omitted)); *Lampros v. Banco do Brasil, S.A.*, No. 10-CV-9576, 2012 WL 6021091, at *8 (S.D.N.Y. Dec. 4, 2012) (granting summary judgment because, inter alia, "this is not a case in which the ultimate decision-maker had no ability independently to assess the plaintiff's performance or relied on the assessment of the plaintiff's direct supervisor who harbored discriminatory animus"), *aff'd*, 538 F. App'x 113 (2d Cir. 2013); *Vahos*, 2008 WL 2439643, at *6 (granting summary judgment where, although a fellow employee who had made discriminatory comments had "initiated the investigation of [the plaintiff] and interviewed several of the people whose accusations eventually led to [the plaintiff's] termination, [the company's] investigators independently corroborated everything").

Here, Plaintiff has proffered no evidence that Berger's recommendation to terminate Plaintiff factored into Lussier's ultimate decision to end Plaintiff's employment. Unlike cases in which employees were terminated for performance issues identified by a non-decisionmaker but relied on by the ultimate decisionmaker, *see Kenchi v. Hanesbrands Inc.*, No. 10-CV-1662, 2011 WL 4343418, at *6 (S.D.N.Y. Aug. 12, 2011) (denying summary judgment where a manager who made discriminatory statements was not the ultimate decisionmaker, but "drafted the [plaintiff's] performance improvement plan," and "'manager feedback' was cited as a basis for [the] plaintiff's need for improved performance"), here, Plaintiff was terminated for a single instance of violating company policy, which can be, and indeed was, independently assessed by the ultimate decisionmaker, as well as by independent internal investigators who themselves conducted interviews and reviewed videotapes. Although Plaintiff points to Berger's own testimony that he initially recommended her termination, she cites no evidence that the

recommendation was ultimately relied on. *See Spratt*, 2014 WL 4704705, at *13 (granting summary judgment where the employer's "ultimate conclusion that [the] [p]laintiff had inaccurately claimed a sick day . . . was based in large part on other evidence having no link to [a supervisor's false allegations against him] whatsoever," and documents reflected that the company had concluded the plaintiff "had violated the Code of Conduct" by failing to disclose an arrest); *Waheed v. SUNY Brooklyn Educ. Opportunity Ctr.*, No. 04-CV-5630, 2007 WL 2126092, at *7 (E.D.N.Y. July 24, 2007) (granting summary judgment on Title VII claim "because it is undisputed that . . . the ultimate decision maker[] did not rely on [a supervisor's] opinion in deciding not to promote [the plaintiff]"); *cf. Mugavero v. Arms Acres, Inc.*, No. 03-CV-5724, 2009 WL 890063, at *20 (S.D.N.Y. Mar. 31, 2009) (denying summary judgment where it was "undisputed" that the decisionmakers relied on a supervisor's characterization of the plaintiff's conduct "in deciding to terminate [the] [p]laintiff's employment"); *see also Abrams*, 764 F.3d at 251 (noting that "the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.").

The record includes no evidence, testimonial or otherwise, demonstrating that, for example, Berger mischaracterized Plaintiff's role in discounting the purchased meat in order to influence Lussier's decision. On the contrary, consistent with Plaintiff's own account, Lussier's declaration indicates that Plaintiff informed her that she refused to discount the meat for Bartley when asked, and that Bartley did so himself; however, rather than interpreting this as evidence of innocence, Lussier believed this suggested that Plaintiff "understood that she could not purchase meat that was reduced in price without proper authorization," and did so anyway, warranting termination. (Lussier Decl. ¶¶ 5–7.) *See Carris v. First Student, Inc.*, No. 13-CV-923, 2018 WL 3747844, at *13 (N.D.N.Y. Aug. 7, 2018) (finding that the plaintiff's admissions that she

violated company policy "alone prevent [the] [p]laintiff from establishing that the reason for termination was false"). Nor did Plaintiff produce evidence undermining Hamilton's independent conclusion that Plaintiff knowingly violated company policy, or demonstrate that Berger influenced that conclusion. (*See* Conroy Memo 3.) *See Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 218 (S.D.N.Y. 2017) (granting summary judgment and noting that "this is not a case where [the] [p]laintiff has adduced facts showing that the charges against him were fabricated by the decisionmakers . . . [or] where a decisionmaker failed to adequately investigate a claim of misconduct," but rather one where the plaintiff argues that the defendant "came to the wrong conclusion"), *aff'd*, 706 F. App'x 44 (2d Cir. 2017). Hamilton's Declaration does not suggest that Berger had any role at all in the investigation beyond attending the interviews of those involved; he states that Faber initially reported the improper purchases, that he reviewed the video footage himself and concluded the Policy was violated, that he reported his findings to Lussier and District Manager John Dearani, and that he conducted interviews of Bartley, Plaintiff, and Kelly and found that they confirmed his conclusions. (*See generally* Hamilton Decl.) In sum, there is no evidence in the record that Berger's bias against Plaintiff played *any* role in the ultimate decision to end her employment. Plaintiff merely reiterates her prima facie case in an attempt to argue that her termination was pretextual; but, although Plaintiff "is entitled to rely on the evidence comprising [her] prima facie case as evidence of pretext," she "is not entitled to survive summary judgment simply by setting forth a prima facie case." *Atterberry v. Ikon Office Sols., Inc.*, No. 02-CV-1490, 2003 WL 22937719, at *9 (D. Conn. Dec. 10, 2003) (citations omitted). She must show that the reason given for her termination was *false*, and that discrimination "was the real reason." *Hicks*, 509 U.S. at 515.

"In the absence of any evidence undermining [Lussier's] assertion that [she] reasonably believed that [Plaintiff] had violated [Defendant's] policies," and that this was the reason she terminated Plaintiff, Defendant is entitled to summary judgment. *Uribe v. Kellogg's Snacks/Keebler, Inc.*, No. 05-CV-2959, 2009 WL 1098369, at \*6 (S.D.N.Y. Apr. 22, 2009) (citation and quotation marks omitted); *see also Blasi v. New York City Bd. of Educ.*, Nos. 00-CV-5320 & 03-CV-3836, 2012 WL 3307227, at \*22 (E.D.N.Y. Mar. 12, 2012) ("Given the scanty evidence of discriminatory intent offered by [the] plaintiff in his prima facie case, [and] the contrary evidence that teachers who were not white Christian males were also terminated for poor performance, . . . that there was a basis for [the] plaintiff's unsatisfactory ratings[,] and the lack of direct evidence of discriminatory motive, [the] plaintiff has not raised any triable issues to show that his termination was pretextual."), *adopted by* 2012 WL 3307346 (E.D.N.Y. Aug. 12, 2012), *aff'd*, 544 F. App'x 10 (2d Cir. 2013). Therefore, Defendants' Motion for Summary Judgment is granted.

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The Clerk of the Court is respectfully requested to terminate the pending Motion, (Dkt. No. 25), grant judgment for Defendant, and close this case.

SO ORDERED.

DATED: July **25**, 2019
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

34